# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| CACI International, Inc. & | ) ASBCA No. 60171 |
| CACI Technologies, Inc. | ) |
| | ) |
| Under Contract No. W15P7T-06-D-E402 | ) |

APPEARANCES FOR THE APPELLANT:    J. William Koegel, Jr., Esq.
                                                                            General Counsel
                                                                         Elizabeth M. Gill, Esq.
                                                                            Deputy General Counsel

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
                                                                               Army Chief Trial Attorney
                                                                            Kyle E. Chadwick, Esq.
                                                                               Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE PROUTY ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND APPELLANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

This appeal comes down to the interpretation of a contract provision permitting appellants, CACI International, Inc. & CACI Technologies, Inc. (CACI, collectively, unless otherwise specified)[1] to be reimbursed by the government for hazardous duty pay made to its employees assigned to work overseas under task orders upon the above-captioned contract (the contract). The pay at issue was 35% of the "basic compensation" made by CACI to its employees. In its pending motion for summary judgment, the government contends that this "basic compensation" is what the CACI employees are paid for non-overtime hours (gov't br. at 6-7). After the employees were paid for the first 40 hours that they worked per week, the government argues, any additional hours that they worked should be considered to be overtime and not subject to the 35% pay supplement (id.). This interpretation, the government argues, is required by our previous case of *BearingPoint, Inc.*, ASBCA Nos. 55354, 55555, 09-2 BCA ¶ 34,289 (id. at 6).

---

[1] The contract was awarded to CACI Technologies, Inc., but the contracting officer's letter demanding payment was sent to CACI, Inc., Federal. CACI International, Inc. is the parent company to both entities, and we allowed appellant to file the appeal initially as CACI International, Inc. and then add CACI Technologies, Inc. to the caption.

CACI urges the Board to recognize that the "normal hours" that its employees were expected to work by the government (depending on the government task order at issue), were either 84 or 72 hours per week, without such hours being considered overtime (app. opp'n at 1).[2] Thus, as CACI would have it, since 84 or 72 hours per week were the employees' expected hours, pay for the entirety of those hours was the employees' basic compensation to which the 35% pay supplement should apply (*id.*). For the reasons stated below, CACI prevails.

## STATEMENT OF FACTS FOR PURPOSES OF MOTIONS

On 3 March 2006, the government awarded to CACI Contract No. W15P7T-06-D-E402 (the contract) (*see* gov't br., Statement of Undisputed Material Facts (SUMF) ¶ 1). The contract was an indefinite-delivery/indefinite-quantity contract and CLIN 0001 was under the Strategic Services Sourcing (S3) Program for the provision of support services to the government in various locations, including overseas (*see id.*). This portion of the contract was cost-reimbursable, meaning that the government would pay CACI for the costs incurred in performing the task order issued under the S3 Program, plus a fee.

The performance work statement (PWS) for the S3 program (which was applicable to the contract) provided that, with the approval of the contracting officer (CO), contractors could pay employees hazardous duty "compensation at rates set in accordance with State Department Guidelines" (SUMF ¶ 4; R4, tab 5 at 32). More on these "State Department Guidelines" will follow shortly.

---

[2] Initially, only the government filed a motion for summary judgment, with no cross-motion being filed by appellants. Because we recognized that the analysis necessary to resolve the government's motion would tend to support summary judgment in favor of appellants if it were denied to the government, we deemed appellants' opposition to the government's motion to constitute a cross-motion for judgment in their favor, while providing the government the opportunity to provide a full response to the cross-motion if it so desired (*see* Bd. order dtd. 30 March 2016). The government did file an additional brief in partial opposition to the granting of summary judgment in favor of appellants, arguing that disputed facts would prevent the Board from granting summary judgment in favor of appellants if the basis for granting the motion rested upon a finding that the contract was ambiguous, requiring parol evidence of the parties' interpretation of the contract (*see* gov't resp. dtd. 12 April 2016). Appellants also filed a separate motion for summary judgment subsequent to the additional briefing detailed above, arguing much the same as before (*see* app. mot. dtd. 29 April 2016). Although we permitted a government response to this motion, we concluded that further briefing from appellants was unnecessary because the salient arguments had already been presented multiple times.

2

On 20 September 2010, the government awarded to CACI Task Order No. 0096 (TO 0096) on the contract (SUMF ¶ 5; R4, tab 9). TO 0096 was for engineering and technical assistance worldwide (*id.*). The task order's PWS specified, in paragraph 8.3, that "[t]he normal workday, when deployed, will be 12 hours per day, seven days per week [*i.e.*, 84 hours per week], or other durations depending on the operational needs" (SUMF ¶ 5; R4, tab 13 at 81). This PWS also addressed premium pay, providing in the immediately-following paragraph, 8.4, that:

> To accommodate the additional cost and inherent risk associated with deployment status, additional premiums for hardship and hazardous duty are authorized, to be billed as 'other direct costs' on a per hour basis. The differentials paid will be IAW the Department of State guidelines for countries within the requested geographical areas.

(R4, tab 13 at 81)

Almost a year later, on 16 September 2011, the government awarded to CACI Task Order No. 0127 (TO 0127) on the contract (SUMF ¶ 6; R4, tab 17). TO 0127 had an associated PWS, but that PWS made no mention of hazardous duty pay (*see* SUMF ¶ 6; R4, tab 14). The government concedes, however, that, under TO 0127, CACI employees were expected to work 72 hours per week (*see* SUMF ¶ 6).[3]

The "State Department Guidelines" referenced in the S3 PWS and the TO 0096 PWS are agreed by the parties to be those contained in the Department of State Standardized Regulations (DSSR) Chapter 650 relating to "danger pay"[4] (*e.g.*, gov't br. at 6-7; app. opp'n at 6-7). Because they are critical to the case, we beg the reader's indulgence as we quote the applicable portions of the regulation, below. Under Section 651, "Definitions," the DSSR[5] provides:

> a. "Danger Pay Allowance" means the additional compensation of up to 35 percent over basic compensation granted to employees (Section 031 and 040i) for service at designated danger pay posts, pursuant to Section 5928,

---

[3] This concession is based upon CACI's complaint before the Board, but CACI's complaint does not provide a supporting citation to the record. Under our rules, we will accept the allegation of the expected hours because the government conceded it, but are not exactly pleased at its lack of support from CACI.

[4] Although the contract specified "hazardous duty pay" (*see* R4, tab 5 at 32), the DSSR does not include a "hazardous duty pay" provision. The parties reference the "danger pay" provision of the DSSR interchangeably with hazardous duty pay, and we consider the two slightly different terms to refer to one and the same thing.

[5] The DSSR may be found at https://aoprals.state.gov/content.asp?content_id=286&menu_id=78.

Title 5, United States Code (Section 2311, Foreign Service Act of 1980) and the provisions of this chapter.

DSSR § 651(a).

Some elaboration may be found under Section 652 of the DSSR, "Scope." In relevant part, it provides that:

> a. The danger pay allowance is designed to provide additional compensation above basic compensation to all U.S. Government civilian employees, including Chiefs of Mission, for service at places in foreign areas where there exist conditions of civil insurrection, civil war, terrorism, or wartime conditions which threaten physical harm or imminent danger to the health or well-being of an employee. These conditions do not include acts characterized chiefly as economic crime.
>
> ....
>
> e.    The amount of the danger pay cannot exceed 35 percent of basic compensation.

DSSR § 652.

The DSSR thus unambiguously (and repeatedly) ties the amount of danger pay to "basic compensation." "Basic compensation" is defined in the "Definitions" section of the DSSR, Chapter 40, paragraph k, and its subheadings. Again, we quote it in full:

> k. "Basic compensation" means the rate of compensation fixed:
>
> (1) by statute for the position held by an employee; or
>
> (2) by administrative action pursuant to law; or
>
> (3) administratively in conformity with rates paid by the Government for work of a comparable level of difficulty and responsibility in the continental United States, before any deduction is made and without taking into consideration any additional compensation such as overtime pay, night pay differential, hazard differential, extra pay for work on holidays, post differential, and allowances; except that for teachers defined in subsection n, hereof, basic compensation means the rate of compensation fixed by the military

4

departments of the Department of Defense for the position held by an individual (including any appropriate increments for having completed a higher level of academic preparation) before any deduction is made and exclusive of all allowances, differentials, or other additional compensation.

DSSR § 40(k). Relatedly, DSSR Chapter 40, paragraph l provides that "'[s]alary' means the basic compensation of an employee...but exclusive of all allowances, differentials or other additional compensation."

Because "overtime pay" is noted as being excluded from basic compensation by its definition, above, we examine those references to overtime pay that are contained in the contract.[6] Clause H-25, entitled "HOURS OF WORK AND OVERTIME," provides in relevant part that:

> 1. Work within the Continental limits of the United States and its possessions shall not normally exceed eight (8) hours per day or forty (40) hours per normal work week. Work hours OCONUS [outside the Continental United States] shall correspond to hours worked by comparable Government personnel, provided a maximum of forty hours per week is not exceeded.
>
> 2. All overtime must be approved in advance by the issuing Contracting Officer. Overtime will be paid at one and a half times the base labor rates on contract for such overtime worked:
>     a. In excess of forty (40) hours per week
>     b. Emergency overtime in case of extreme emergency, where delay would endanger accomplishment of essential theatre missions, the contracting officer may authorize overtime.

(R4, tab 1 at 41)

The contract incorporates a tailored version of standard FAR clause 52.222-2, PAYMENT FOR OVERTIME PREMIUMS (JUL 1990) into contract clause I-21. The introductory paragraph provides that: "The use of overtime is authorized under this contract if the overtime premium cost does not exceed ZERO or the overtime premium is paid for work [in four specified circumstances that are either of an emergency nature or not amenable to being performed efficiently without overtime]." (R4, tab 1 at 65)

---

[6] The DSSR does not define "overtime," except for use in Chapter 800, which deals with compensatory time off for government employees. *See* DSSR § 811(b).

5

CACI in fact, paid no overtime premium to its employees who worked on TOs 0096 and 0127, but did pay them danger pay based upon their salaries, which reflected the actual hours worked by those employees, *i.e.*, the 72 and 84-hour workweeks required by the two TOs (SUMF ¶¶ 8, 9). CACI included these costs in its invoices to the government (*id.*), and the CO appears to have compensated CACI for this expense, without apparent objection, until challenged by the Special Inspector General for Afghanistan Reconstruction (SIGAR) (*see* SUMF ¶¶ 10, 11). SIGAR's challenge to the payment was not that there was a question of entitlement to danger pay, but that the portion of CACI employee salaries that could be attributable to hours greater than 40 per week constituted overtime for which no hazardous duty pay could be paid (R4, tab 28 at 22). The amount that SIGAR determined that the government overpaid to CACI as a result of the danger pay calculations that were different than what SIGAR believed it to be entitled was $14,637 for TO 0096 and $25,095 for TO 0127, totaling $39,732, altogether (SUMF ¶ 10; R4, tab 28 at 22).

Consistent with SIGAR's recommendations, on 31 July 2015, the CO demanded repayment for the costs questioned by the SIGAR audit report, which included both the alleged danger pay overpayment and other costs questioned by SIGAR that are not relevant to this appeal (*see* SUMF ¶ 11; R4, tabs 30, 31). On 26 August 2015, the CO emailed to CACI a "final determination" that CACI must pay the government the $39,732 in challenged danger pay and also directed CACI to modify its payroll and billing practices to avoid paying danger pay on hours greater than 40 worked per week (SUMF ¶ 12; R4, tab 34). CACI deemed that CO final determination to be a final decision and on 11 September 2015, timely appealed it to the Board.

## DISCUSSION

This case may be crystallized thus: under the terms of the contract, (which includes the DSSR), the government may not require CACI employees to work 72 or 84-hour weeks as a matter of course, not subject to overtime pay, and then assert that the proportionate amount of their salary for hours greater than 40 per week should be considered "additional compensation," for which danger pay was inapplicable. In accordance with the terms of the contract, the traditional 40-hour week was an illusory figure with no meaning – it cannot be used to justify an arbitrary reduction of the CACI employees' entitlement to danger pay.

I.     The Standards for Summary Judgment

The standards for summary judgment before the Board are well established[7] and need little elaboration here. Summary judgment should be granted if it has been shown that there are no genuine issues of material fact and the moving party is entitled to

---

[7] Board Rule 7(c)(2) provides that the Board looks to FED. R. CIV. P. 56 for guidance in deciding motions for summary judgment.

judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)).

## II. The Contract Requires the Payment of Danger Pay on TOs 0096 and 0127 to be Computed Based on an Employee's "Basic Pay"

Some terms of the contract are relatively clear. The S3 PWS and the PWS for TO 0096 both address danger pay. The S3 PWS allowed that, with the approval of the CO, contractors could pay employees hazardous duty "compensation at rates set in accordance with State Department Guidelines." And the TO 0096 PWS explicitly determined that danger pay was permissible under its provisions, effectively constituting the CO's approval of CACI's making such a payment to its employees.

CACI's entitlement to make hazardous duty payments to its employees under TO 0127 is somewhat less straightforward, inasmuch as such pay is not specifically mentioned by TO 0127. Nevertheless, it is uncontroverted that CACI, with the government's knowledge, made such payments to its employees under TO 0127, and that the government's later challenge to the practice was that CACI was overpaying its employees, not that they lacked entitlement to *some* hazardous duty pay (*see generally* SUMF ¶ 10; R4, tab 29 at 3-4). We view this series of events as manifesting the CO's assent to CACI's making such danger pay, in accordance with the S3 PWS, for work performed on TO 0127. Indeed, the government makes no challenge to the propriety of there being an entitlement to hazardous duty pay for work performed on TO 0127.

Since the contract incorporates the DSSR, which limits payment of danger pay to a percentage of "basic compensation," the salient question remaining, then, is what constitutes basic compensation under the contract.

## III. An Employee's Basic Compensation under the Contract is its Pay for Normal Work Hours

We conclude that an employee's pay for his or her normal or usual work hours under the contract constitutes its basic compensation. We arrive at this conclusion for two independent reasons: first, those portions of the DSSR that exclude "overtime pay" are not applicable to the contract; second, despite working significant hours in excess of 40 hours per week, CACI employees were paid no overtime premium.

7

## A. The Contract does not Exclude Hazardous Duty Pay on "Overtime" Hours

The DSSR's definition of "basic compensation" is problematic for application to contractor employees: it is simply inapplicable.[8] As defined in section 40(k), the DSSR provides three alternative definitions of basic compensation; none are helpful. The first alternative is a pay rate set by statute for the employee's position, which is plainly inapplicable here, because no statute set the salary that CACI paid its employees. The second alternative is a rate set "by administrative action pursuant to law," which is inapplicable for the same reason. By process of elimination, it appears, the parties have turned to the third, and final, alternative definition of basic compensation (*see* tr. 9[9] (gov't attorney); gov't br. at 7; compl. ¶ 33; *but see* tr. 30-31, 38-39 (CACI's counsel arguing that DSSR § 40(k) is inapplicable)), which fares no better on close analysis.

This third alternative defines basic pay as: "administratively in conformity with rates paid by the Government for work of a comparable level of difficulty and responsibility in the continental United States, before any deduction is made and without taking into consideration any additional compensation such as overtime pay." But there is nothing "administratively in conformity with rates paid by the Government for work of a comparable level of difficulty and responsibility in the continental United States," about the pay that CACI made to its employees, and neither party has made any effort to explain how it could be so. Thus, the third alternative (and with it, its explicit exclusion of overtime pay) is inapplicable to the circumstances presented by the contract as well.

Having determined that, by its language, the DSSR's definitions of basic pay are inapplicable to the circumstances presented here, we consider alternate arguments for reading the DSSR as prohibiting overtime pay, and find them unpersuasive.

The government primarily relies upon our prior case of *BearingPoint, Inc.*, 09-2 BCA ¶ 34,289, to foreclose probing analysis of the meaning of the DSSR and to support leaping to the result that the pro-rated amount of salary over 40 hours per week is not subject to hazardous duty pay (gov't br. at 6-7). *BearingPoint*, however, does not provide all that the government wishes.

To be sure, *BearingPoint* presents a superficially similar set of facts to those here: it held that, in a contract for work in Iraq, danger pay was only to be paid on the basis of a 40 hour week. *See BearingPoint*, 09-2 BCA ¶ 34,289 at 169,400. The contract in *BearingPoint* also referenced the DSSR for its calculation of danger pay. *Id.* But the contract in *BearingPoint* had a provision, not to be found in the contract here, that

---

[8] We view this as less a flaw in the DSSR, which was drafted to apply to government employees, than a flaw in the contract, which simply imported the DSSR without apparently contemplating how it would apply to civilian contractor employees.

[9] "Tr.__" refers to a page of the transcript of the oral argument held on this motion on 29 March 2016.

changes everything: the "differentials and allowances clause" in the *BearingPoint* contract provided for danger pay "not to exceed that paid USAID employees in the cooperating country." *Id.* at 169,396. And this is the clause, we held in *BearingPoint*, which effectively tied the contractor's employees' salaries to the same 40-hour construct under which federal employees labor. *Id.* at 169,400. The contract here, by contrast, only stated that the pay rates would be "in accordance with State Department Guidelines," but did not limit the pay in any other way.

The government might argue that, by applying "State Department Guidelines," the contract necessarily requires CACI's employees to be treated the same way that State Department employees are treated, but this would be too much a stretch. In *BearingPoint*, we looked to the limits of federal employee compensation under the DSSR only because we were required to do so by the terms of the applicable contract, which demanded a comparison to USAID employees, *see BearingPoint*, 09-2 BCA ¶ 34,289 at 169,400; here, there is simply no reason to tether CACI employees' base pay to any of the three alternatives proposed in DSSR § 40(k).

In the absence of any applicable definition contained in the DSSR, we take "basic pay" at its common meaning: the salary given to CACI employees before being subject to any multipliers or additions. This tracks well with DSSR § 40(l), which equates salary to basic compensation "exclusive of all allowances, differentials or other additional compensation." Interestingly enough, our definition is conceptually closest to the first definition contained in DSSR § 40(k), in which a salary set by an outside body (in DSSR § 40(k), a statute; here, by CACI) is not parsed in any way before being deemed to be the basic pay of an individual. As far as the evidence presented to us goes, that means that CACI employees' salaries for whatever number of hours per week that they worked (for which they received no premium pay) is the only proper amount that could be considered basic pay.

B. Work Weeks in Excess of 40 Hours are not Overtime under the Contract

Even if we were to read the contract and DSSR together to preclude payment of "overtime," we would, nevertheless, conclude that the CACI employees working under TOs 0096 and 0127 were not working overtime because the contract treated them as if they were not. In clause H-25, the contract requires all overtime work to be paid at a 50% premium over regular time, and then, in clause I-21, unhelpfully, allows overtime so long as the premium is zero *or* it fits within one four specified instances of a sort of work that is in the government's particular interest to have completed by overtime work. We reconcile these two seemingly-contradictory clauses by reading the zero premium alternative in clause I-21 as one that would never happen in the event of authorized overtime: that is, pursuant to clause I-21, the only way that overtime could be authorized by the CO is in those four clause-specified instances in which overtime was in the government's interest, in which case it would be compensated at the traditional time-and-a-half rate required by clause H-25. Under this reading, the reason that the

9

contract included the meaningless "zero premium" language in clause I-21 is that the FAR-provided language of clause I-21 left a blank before the word "premium," and the only way that the government drafter of the contract could make the standard language of clause I-21 reflect the intent of strictly delimited authority for use of overtime was to insert "ZERO" in that blank spot.

Because the parties agree that CACI employees were not paid the 50% premium required by the contract for overtime, it is apparent that the parties did not consider the work over 40 hours a week to constitute overtime for which payment was required. To be sure, section H-25, paragraph 1 of the contract provides that contractor employees are not expected to work greater than 40 hours per week, but this is overcome by the later-executed task orders, directing 84 and 72-hour work weeks for the relevant CACI employees as a matter of course. If these 84 and 72-hour work weeks did not trigger a requirement to pay the employees any kind of premium, despite the contract's requirements that "overtime" be paid at a premium, and the task orders imposing such workweeks did not characterize them as a type of overtime that is excused from premium pay (as they did not), the contract cannot, nevertheless, be interpreted to deem such work to be overtime for the sole, yet unexpressed, purpose of arbitrarily limiting danger pay to CACI's employees.

We note, in further support of this contract interpretation, that it is absolutely consistent with that analytical framework of Part 22 of the FAR, governing the application of labor law to government acquisitions. This portion of the FAR specifies that, even when government contractor employees work more than 40 hours per week, if they are overseas, the hours are customary for the area, and they are not paid a premium for the work greater than 40 hours, these long hours are considered to be a "normal workweek." FAR 22.103-1. "Overtime" is defined in the FAR as "time worked by a contractor's employee in excess of the employee's normal workweek." FAR 2.101. Thus, the FAR does not consider work in excess of 40 hours to be overtime if it is part of the employee's "normal workweek." The hours worked here, were part of the CACI employees' normal workweeks, and thus not considered to be overtime under the FAR definition.

Of course, we must address *BearingPoint* on this topic as well: the government argues that *BearingPoint* interprets hours in excess of 40 to be overtime under the DSSR and that the meaning of the DSSR cannot change just by virtue of its being applied to a different contract (gov't reply br. at 1). On its face, this argument is appealing, and we are in complete agreement with the government that the meaning of a regulation should not vary from case to case. Nevertheless, it is not the meaning of the DSSR that is at issue here, but the meaning of the contract. As we discussed above, the conclusion of *BearingPoint* was driven by the contract terms tying contractor pay to the limits imposed upon government employees, not by the DSSR alone. Accordingly, we come to a different conclusion concerning the hours subject to danger pay here without doing any violence to our interpretation of the DSSR in *BearingPoint*.

10

## CONCLUSION

For the reasons stated herein, we grant summary judgment in favor of appellants, sustaining the appeal, and deny the government's motion for summary judgment.

Dated: 18 July 2016

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60171, Appeal of CACI International, Inc. & CACI Technologies, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

11